# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

* * *

| | |
|---|---|
| NIKTA JANATI, | Case No. 2:15-cv-01367-APG-CWH |
| Plaintiff, | **ORDER 1) GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT, 2) DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT, AND 3) DENYING MOTION TO DISMISS AS MOOT** |
| v. | |
| UNIVERSITY OF NEVADA, LAS VEGAS SCHOOL OF DENTAL MEDICINE; R. MICHAEL SANDERS; STANLEY NELSON; CHRISTOPHER KYPUROS; KAREN WEST; BRANDON BIEHLER; and ELENI COLLIS, | (ECF Nos. 30, 48, 49, 50) |
| Defendants. | |

Plaintiff Nikta Janati attended dental school at defendant University of Nevada, Las Vegas School of Dental Medicine (UNLV). In 2013, she was suspended for a year for presenting another student's work as her own. She now brings claims against UNLV and individual faculty members contending that the investigation and hearing regarding the charges against her of academic misconduct violated her due process rights under the 14th Amendment to the United States Constitution and her contractual rights under UNLV's student policy manual. She also claims the investigation was initiated in retaliation for her prior complaint against a graduate faculty member, violating her First Amendment rights.

UNLV and the individual defendants move for summary judgment, arguing that the 14th Amendment prescribes only "rudimentary" process in academic disciplinary contexts, which Janati received even under the facts as she presents them. Her contract rights in the policy manual, UNLV argues, are similarly limited to protecting against only "arbitrary and capricious" or "bad faith" conduct, and there was no such conduct here. Lastly, the defendants argue her First Amendment claims fail because there is no evidence to support retaliatory motive.

Because courts exercise deference in applying procedural and contractual precepts to the relationship between universities and their students, Janati's claims cannot succeed. She also fails to establish all the elements of a First Amendment claim against either UNLV or the individual defendants. I therefore grant the defendants' motions for summary judgment and deny Janati's motion for partial summary judgment. I deny the motion to dismiss as moot.

**I. BACKGROUND**

Janati began her dental studies at UNLV in the fall of 2012. ECF No. 29 at 3. On June 21, 2013, she participated in a practical lab exam involving work on a tooth in a mannequin model. For this exam, each step was checked by a faculty member. *Id.* During the exam, a rubber dam that Janati was using broke. A recent graduate and preclinical faculty member, Justin Perdichizzi, told her to place another dam and said he would "sign [her] off."[1] *Id.* at 4. Once she placed the new dam, she could not find Perdichizzi, so she had another faculty member sign her off. When Perdichizzi returned, he scolded Janati for not waiting for him to sign her off. He then "proceeded to mock and laugh" at Janati with his fellow graduate students. *Id.*

Janati complained to defendant faculty member Dr. R. Michael Sanders about Perdichizzi's behavior, asserting her belief that it was "based on inappropriate comments concerning her Iranian national origin and her gender."[2] She asked Sanders to put a stop to any further similar conduct. *Id.*

On June 25, 2013, defendant Dr. Stanley Nelson assigned to his class a project that called for waxing teeth on a model. ECF No. 48 at 6. The syllabus required three teeth be waxed; Janati was absent for the June 25 lecture where Nelson added a fourth tooth to the assignment. *Id.* She completed the project per the syllabus with three teeth waxed by the July 2 due date. *Id.*

---

[1] Presumably this means authorize her to continue her exam.

[2] Sanders denies any recollection of this meeting. For the purposes of evaluating the defendants' summary judgment motions, I resolve factual disputes for the non-moving party and take as true that the meeting happened.

A different faculty member signed it off as complete on that day, despite not having the fourth tooth waxed. *Id.*[3]

The day after the tooth waxing project was submitted, Janati was working on a project in the "wet lab" that involved mounting a project on her articulator.[4] *Id.*  Janati was approached by a fellow student, Arin Alexander, who told her that defendants Drs. Brandon Biehler and Eleni Collis were taking photographs of casts on Janati's assigned bench in an adjacent lab. *Id.* at 7.

According to Janati's complaint, she interpreted the information from Alexander to mean that Biehler was looking for her tooth waxing project. ECF No. 29 at 5.  Desiring to show Biehler her project, but not having an unoccupied articulator on which to mount it, she borrowed Alexander's, which still had his completed tooth waxing project mounted on it. *Id.*  Carrying both her unmounted project and Alexander's project mounted on his articulator, she approached Biehler, who was working with another student. ECF No. 48-1 at 50.  Janati set down Alexander's project on an "unassigned" bench near Biehler. *Id.*  She returned her project to her assigned drawer and locked it. *Id.* at 51.  She then returned to the adjacent wet lab. *Id.* at 52.

Biehler left the lab, carrying the articulator and mounted project that Janati had left near him.  He scanned it and determined that the articulator was registered to Alexander. ECF No. 48 at 8.  Biehler returned to the lab and asked Alexander for his articulator, but Alexander could not produce it. *Id.*  He then asked Janati for her tooth waxing project. *Id.*  She produced her unmounted project from her drawer and gave it to him.  Biehler brought both Janati's unmounted project and Alexander's mounted project on his articulator to Sanders.  Biehler explained his perception that Janati had attempted to present Alexander's project as her own work. *Id.*  Janati went to Sanders' office later that day to explain herself.  According to Sanders, Janati admitted at

---

[3] Janati does not dispute that the project requirements were changed in class, rendering her submitted project incomplete.  She contends, however, that because a faculty member signed off on her project and she had not attended that class, she believed it was complete.

[4] An articulator is a device used in dentistry upon which casts of teeth can be mounted for viewing.  They are re-useable for different casts, and can be considered as a stand for mounting projects.

that time "she knew the work was not hers but . . . she didn't want to show the faculty unmounted models when they asked to see her project." ECF No. 53 at 11.  Sanders informed her the matter would wait for Nelson's return from abroad.

After Nelson returned, he, Sanders, and Janati met to discuss the incident.  Nelson was unconvinced by Janati's account of what had happened and concluded she had attempted to present Alexander's work as her own. ECF No. 29 at 7–8.  Sanders wrote a memorandum "complaint" on July 18, 2013 to Dr. William Davenport, the Associate Dean for Academic Affairs, describing the incident and recommending that Janati's actions be reviewed by the school's Honor Council. ECF No. 48-4 at 8.  His letter did not specifically name either Biehler or Collis, but described them as "two preclinical faculty" and thereafter "the faculty." *Id.* Davenport forwarded the complaint to the school's Honor Council. ECF No. 29 at 9.

Defendant Dr. Christopher Kypuros, chair of the Honor Council, decided the complaint merited further investigation. *Id.*  On July 31, 2013, he sent Janati a letter notifying her of Sanders' complaint. *Id.*  Based on interviews he conducted with faculty members, which he reported to the Honor Council, the Council decided to proceed to a hearing. *Id.* at 10.

On September 17, 2013, Kypuros sent Janati a Notice of Formal Hearing to take place on October 8, 2013. ECF No. 48-4 at 72.  The letter notified her that she was alleged to have committed "academic misconduct," "misrepresentation," and "unprofessional behavior" based on the facts contained in Sanders' July 18 complaint, which Kypuros attached.  The letter also informed Janati of her rights to present witnesses, evidence, and have an attorney present at the hearing. *Id.*  On October 1, 2013, Kypuros sent to Janati a list of witnesses who might be called to testify and documents that might be introduced at the hearing. *Id.* at 76.  Biehler and Collis were not listed as witnesses, but the letter noted that "statements" from both might be introduced. The hearing took place on October 8.  At the hearing, a written statement from Collis was read by Kypuros, but no testimony from Biehler was produced. ECF No. 48-5 at 3–21.  On October 14, 2013, the Honor Council wrote a letter to defendant Dean West stating that it had held a hearing, deliberated, and unanimously voted to find that Janati had committed Honor Code

violations by presenting "another student's work as her own when faculty requested to see the project." *Id.* at 24.

After the initial hearing, Dean West requested that the hearing be reconvened to include the testimony of Biehler. ECF No. 29 at 11.  The hearing was reopened on October 30, 2013 and Biehler testified by telephone. *Id.* at 12.  The Honor Council reaffirmed its finding that Janati had committed the misconduct with which she was charged. ECF No. 48-5 at 39.

On November 13, 2013, West sent a letter to Janati notifying her that she would be temporarily suspended from school, effective immediately. ECF No. 29 at 12.  The allegations supporting the suspension were that she engaged in "academic misconduct," "misrepresentation," and "unprofessional behavior" by "presenting another student's work as her own when faculty requested to see her project." ECF No. 48-5 at 41.

## II.  ANALYSIS

Summary judgment shall be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The moving party "has the initial burden of showing the absence of a genuine issue of material fact." *Pioneer Chlor Alkali Co., Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 863 F. Supp. 1237, 1239 (D. Nev. 1994) (citations omitted).  "A material issue of fact is one that affects the outcome of the litigation and requires a trial to resolve the differing version of events." *Id.* (citations omitted).  Once the moving party satisfies its initial burden, the burden shifts to the non-moving party to set forth specific facts showing that there is a genuine issue for trial. *Id.* (citations omitted).  The non-moving party "may not rely on denials in the pleadings but must produce specific evidence, through affidavits or admissible discovery material, to show that the dispute exists." *Bhan v. NME Hosp., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991).

### A.  14th Amendment Procedural and Substantive Due Process

Janati contends that the procedure UNLV followed in investigating and suspending her violated her procedural and substantive due process rights under the 14th Amendment to the United States Constitution.  UNLV moves for summary judgment on the grounds that courts

require only "some kind of notice" and "some kind of hearing" to satisfy procedural due process in the context of higher education disciplinary proceedings, which UNLV provided.  The standard to satisfy substantive due process, UNLV argues, is even less onerous—the school's action must not be "arbitrary and capricious" or in "bad faith."  UNLV contends Janati's suspension was supported by the evidence and that there is no indication of bad faith.

### i.     Procedural Due Process

University students likely have some procedural due process rights in academic disciplinary proceedings. *See, e.g.*, *Nash v. Auburn Univ.*, 812 F.2d 655, 660–61 (11th Cir. 1987); *Dixon v. Alabama State Bd. of Educ.*, 294 F.2d 150, 157–59 (5th Cir. 1961).  But there are "competing interests" in the educational context. *Goss v. Lopez*, 419 U.S. 565, 579 (1975).  A "full-dress judicial hearing, with the right to cross-examine witnesses . . . might be detrimental to the college's educational atmosphere and impractical to carry out." *Dixon*, 294 F.2d at 159.  The required process has therefore been described as the "rudimentary" minimums of "some kind of notice and . . . some kind of hearing." *Goss*, 419 U.S. at 579.

Janati argues she was not afforded the specific protections enumerated in *Dixon* that the student must receive adequate notice of each claim against her and "the names of the witnesses against [her] and an oral or written report on the facts to which each witness testifies." 294 F.2d at 159.

First, Janati complains that she did not receive notice of each claim against her in advance of the hearing because neither the September 17 letter from Kypuros nor the July 18 Sanders complaint specified that the charge of "unprofessional behavior" was grounded, in part, on her

belligerence in confronting Collis about taking pictures of her bench.  West's letter suspending Janati, however, describes the verified allegations against her as follows:

> Janati violated the UNLV SDM Honor Code by presenting another student's work as her own when faculty requested to see her project. Therefore Ms. Janati's alleged violations involved:
>
> Academic Misconduct
> Misrepresentation
> Unprofessional Behavior.

ECF No. 48-5 at 41.  No mention is made of rudeness or belligerence to Collis as a ground for suspension.  The inquiry into Janati's alleged belligerence toward Collis, even if it was contained in Collis's written statement that was read at the October 8 hearing, therefore was not a factor in her suspension.  Thus, Janati can claim no harm from any procedural injury in that respect.

Second, Janati contends she was not given written witness statements before the hearing. But Janati was notified before the hearing of the witnesses against her and the basic facts to which each witness testified.  The Honor Council gave her Sanders' complaint, which detailed the facts of the allegation.  In advance of the hearing, the Honor Council identified potential witnesses and documents that would be presented against her.  Janati used this time to retain an attorney, who was present at the hearings, and to collect witness statements.  Janati was able to present her own account of what happened, present her own witnesses, and cross-examine the witnesses.  She was also able to cross-examine Biehler by telephone at the second hearing.[5]

In short, UNLV provided process that cleared the "rudimentary" minimums of "some kind of notice" and "some kind of hearing" required in the academic disciplinary context. Because the evidence does not raise a genuine dispute about the adequacy of the procedures

---

[5] *Dixon* explicitly noted that the ability to cross-examine witnesses is not constitutionally required in an academic disciplinary proceeding, so in this respect UNLV's procedures exceeded the standard. *See* 294 F.2d at 159.

provided, I grant the defendants' motions for summary judgment on Janati's procedural due process claim.

ii.     *Substantive Due Process*

To establish a violation of substantive due process based on a university disciplinary proceeding, "a student must demonstrate arbitrary and capricious conduct on the part of university officials by showing that there was no rational basis for the university's decision, or must show that the dismissal was motivated by bad faith or ill will." *Gamage v. Nevada ex rel. Bd. of Regents of Nevada Sys. of Higher Educ.*, No. 2:12-CV-00290-GMN, 2014 WL 250245, at *10 (D. Nev. Jan. 21, 2014) (citing *Bd. of Curators of Univ. of Mo. v. Horowitz,* 435 U.S. 78, 91–92 (1978)), *aff'd sub nom. Gamage v. Nevada ex rel. Bd. of Regents of Higher Educ.*, 647 F. App'x 787 (9th Cir. 2016).

Janati contends "material factual disputes . . . exist within the testimony" that might have weakened the case against her.  But even granting Janati inferences for contested facts, the Honor Council went through a lengthy deliberative process and made a supportable decision given the evidence in front of it.  The Council's conclusion that Janati presented Alexander's work as her own had a rational basis—no more demanding standard was required.

Janati presents no evidence to support a contention that the faculty on the Honor Council undertook the investigation and hearing in bad faith.  She offers no retaliatory motive as to the other Honor Council members; defendants Sanders, Kypuros, and West; or UNLV generally. The significant process she received confirms that the investigation was undertaken in good faith and the resulting decision was not arbitrary and capricious in light of the evidence presented.

Because there is no evidence the defendants acted in bad faith or arbitrarily and capriciously, I grant the defendants' motions for summary judgment on Janati's substantive due process claim.

**B.  Breach of Contract**

Janati argues that she had a contractual relationship with UNLV and that violations of the Student Policy Manual constituted breach of contract and breach of the implied covenant of good

faith and fair dealing.  The defendants agree that the student-university relationship is contractual, but contend that the university's application of disciplinary procedures is due significant deference.

The parties agree that the standard for analysis of alleged violations of a university's disciplinary procedures—in the context of a breach of contract claim—is whether the procedures used were "arbitrary, capricious, or in bad faith." *Lucey v. State ex rel. Bd. of Regents of the Nev. Sys. of Higher Educ.*, No. 2:07-cv-00658-RLH-RJJ, 2009 U.S. Dist. LEXIS 30132, at *16 (D. Nev. Apr. 8, 2009).[6]  Procedures are arbitrary and capricious if they are "without any discernable rational basis." *Id.*  This is the same standard as that used for the substantive due process claim I found wanting above, so Janati's contract claim cannot move forward.

It is questionable whether the *Lucey* test is really "contractual" in nature because it does not require reference to any contract or agreement.  However, many cases have recognized the need for flexibility when analyzing the contractual relationship between the student and university, and that "hornbook rules cannot be applied mechanically" in such situations. *See, e.g.*, *Amaya v. Brater*, 981 N.E.2d 1235, 1240 (Ind. Ct. App. 2013) (citation omitted).  "Courts have applied contract law flexibly to actions involving academic and disciplinary decisions by educational institutions because of the lack of a satisfactory standard of care by which to evaluate these decisions." *Kashmiri v. Regents of Univ. of Calif.*, 156 Cal. App. 4th 809, 826 (Cal. Ct. App. 2007) (cited with approval by *Robinson v. Nev. Sys. of Higher Educ.*, No. 3:15-cv-00169-MMD-VPC, 2015 WL 8780244, at *3 (D. Nev. Dec. 15, 2015)).  The *Amaya* court reconciled the standards by laying out the broad or crucial procedural protections listed in the university's policy and evaluating whether the university "substantially followed" them. 981 N.E.2d at 1241 ("Literal adherence by a university to its internal rules will not be required when the dismissal of a student rests upon expert judgments as to academic or professional standards and such judgments are fairly and nonarbitrarily arrived at.") (citation omitted).

---

[6] ECF No. 54 at 29.

Janati offers many supposed departures from the policy manual.  I evaluate here the few that might raise issues rising to breach under the *Amaya* standard.

The manual directed that faculty complaints of Honor Code violations include specifics of the alleged prohibited conduct and who could attest to it. ECF No. 60 at 11.  Sanders' complaint met this requirement, but referred to Biehler and Collis as "two preclinical faculty," rather than specifically naming them.  This oversight did not deprive Janati of her ability to understand the allegations against her when she received a copy of the complaint in advance of the hearing.  First, with the information Sanders provided and her participation in the events in question, she knew who Sanders meant by the "two preclinical faculty" because she confronted both of them the day of the incident.  The identity and testimony of the witnesses was also fully unearthed as the investigative process continued.  Moreover, Sanders relied in part on facts from his own meeting with Janati, where she admitted to "kn[owing] the work was not hers." ECF No. 53 at 11.

Janati also complains that Kypuros did not satisfy the manual's provision to "state in writing the grounds upon which the complaint is based" because it did not specify that the charge of "unprofessional conduct" was grounded, in part, on her belligerence in confronting Collis about taking pictures of her bench.  As discussed above, her alleged belligerence played no role in Janati's suspension.

Lastly, Janati questions whether Kypuros interviewed Biehler, the most central witness, in his pre-hearing investigation.  Kypuros and Biehler's testimony is unclear on the point, and Janati's contention is perhaps strengthened by the fact that Kypuros did not procure a statement from Biehler or summon him to testify at the first Honor Council hearing.  This oversight, if it occurred, was cured by the second hearing during which Biehler testified by phone.

Even under a standard that demands substantial compliance with the written disciplinary procedures, the evidence does not support a claim for breach of contract or breach of the implied

covenant of good faith and fair dealing.  I therefore grant the defendants' motions for summary judgment on Janati's contract claim.

### C.  First Amendment Retaliation

Janati bases her First Amendment claim on the allegation that Biehler, Collis, and Sanders reported her for academic misconduct in retaliation for an earlier complaint she made against Biehler and Collis's fellow graduate student, Perdichizzi.  The defendants argue that Janati has not provided evidence to credibly suggest that Biehler or Collis knew about the complaint, and that all three defendants have a legitimate reason for reporting her because she presented another student's work as her own.

A First Amendment retaliation claim requires that "the protected activity was a substantial or motivating factor in the defendants' conduct," which necessitates that the alleged retaliator know about the protected activity. *See Pinard v. Clatskanie Sch. Dist. 6J*, 467 F.3d 755 (9th Cir. 2006).  Once knowledge is established, a plaintiff can attempt to support his prima facie showing of retaliatory motivation in one of three ways:

> First, a plaintiff can introduce evidence regarding the proximity in time between the protected action and the allegedly retaliatory . . . decision, from which a jury logically could infer that the plaintiff was terminated in retaliation for his speech.  Second, a plaintiff can introduce evidence that [the retaliator] expressed opposition to his speech, either to him or to others.  Third, the plaintiff can introduce evidence that [the retaliator's] proffered explanations for the adverse . . . action were false and pre-textual.

*Coszalter v. City of Salem*, 320 F.3d 968, 977 (9th Cir. 2003) (citations omitted).  "Once a plaintiff establishes a prima facie case, the burden of production shifts to the employer to articulate a legitimate, non-retaliatory explanation for the action." *Miller v. Fairchild Indus., Inc.*, 797 F.2d 727, 731 (9th Cir. 1986).  "If the employer successfully rebuts the inference of retaliation that arises from establishment of a prima facie case, then the burden shifts once again to the plaintiff to show that the defendant's proffered explanation is merely a pretext for discrimination." *Id.*

Janati concedes she has no direct evidence that Biehler or Collis knew about her complaint against Perdichizzi, but argues four pieces of circumstantial evidence create a genuine issue of material fact on that question: 1) Collis and Biehler were classmates and friends of Perdichizzi; 2) Perdichizzi was no longer assigned to the class after the complaint; 3) Biehler allegedly heard unrelated rumors that Janati was getting help from another student on her projects; and 4) Biehler and Collis's report to Sanders was close in time to her complaint. ECF No. 55 at 17.  This circumstantial evidence does not raise a genuine dispute about Biehler and Collis's knowledge of the complaint, especially in light of the fact that Janati does not present evidence that even Perdichizzi was notified of the complaint against him.  If anything, the rumors that Janati was receiving illicit help on her projects, combined with what Biehler saw as Janati's suspicious behavior with respect to the tooth waxing project, provides an alternative, legitimate explanation for why they reported her.  Janati has not offered sufficient evidence to raise a genuine issue of material fact as to whether Biehler or Collis knew about her complaint against Perdichizzi, so I grant summary judgment on Janati's First Amendment retaliation claim against them.

Sanders knew about the protected speech because Janati made the complaint about Perdichizzi to him; his memorandum to the Honor Council about Janati's alleged misconduct followed that meeting by only a few weeks.  Therefore, Janati states a prima facie claim.  But Sanders rebuts this inference of retaliation by explaining that he received a credible report from Biehler, corroborated by Sanders' conversation with Janati, that she committed academic misconduct by presenting another student's work as her own.  The proximity of the timing of the complaint to Janati's protected speech was a function of Janati's conduct, not Sanders' discretion.  His actions in conveying to the Honor Council Biehler's report, as well as his own conversation with Janati, was legitimate.  Janati offers no evidence to undermine it as pretextual. I therefore grant summary judgment on Janati's First Amendment claim against Sanders as well.

1

**III.   CONCLUSION**

2      IT IS THEREFORE ORDERED that the defendants' motions for summary judgment

3  **(ECF Nos. 48 and 49) are GRANTED** and the plaintiff's motion for partial summary judgment

4  **(ECF No. 50) is DENIED.**

5      IT IS FURTHER ORDERED that the defendants' motion to dismiss **(ECF No. 30) is**

6  **DENIED as moot.**

7      The clerk of court is directed to enter judgment in favor of the defendants and against the

8  plaintiff and close this case.

9      DATED this 28th day of March, 2017.

10

11      _____

12      ANDREW P. GORDON
       UNITED STATES DISTRICT JUDGE

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28